UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA,
NORFOLK DIVISION

-----------------------------------------------------------------X

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION,

5000 West Side Avenue
North Bergen NJ 07047

                Plaintiff

v.

VIRGINIA PORT AUTHORITY and STEPHEN EDWARDS, in his official capacity as CEO and Executive Director of the Virginia Port Authority,

101 West Main Street, Suite 600
Norfolk, VA 23510

                Defendants.

-----------------------------------------------------------------X

Civil Action No.:

**COMPLAINT**

Plaintiff International Longshoremen's Association, 5000 West Side Avenue, North Bergen, New Jersey, by and through its undersigned attorneys, Beins, Axelrod & Keating, P.C. and Mazzola Mardon, P.C., by and for its Complaint, respectfully alleges as follows:

**PARTIES**

1.    Plaintiff International Longshoremen's Association ("ILA" or "Plaintiff") is an unincorporated association and an international labor union, with its principal office located at 5000 West Side Avenue, North Bergen, Hudson County, New Jersey. The ILA is a "labor organization" within the meaning of Section 2(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 152(5), and represents a coastwide, multiport bargaining unit of longshore workers and related crafts at port areas from Maine to Texas, including the Port of Virginia. The ILA also represents

1003-656
147552

various local bargaining units in the Great Lakes region, the Bahamas, Puerto Rico, major U.S. rivers, as well as Eastern Canada.

2.       Defendant Virginia Port Authority ("VPA" or "Defendant VPA") exists pursuant to statute as an "public instrumentality" of the Commonwealth of Virginia. Va. Code Ann. § 62.1-128. The enabling statute makes it the duty of VPA to "foster and stimulate the commerce of the ports of the Commonwealth," . . . promote the shipment of goods and cargoes through the ports, . . . seek to secure necessary improvements of navigable tidal waters within the Commonwealth, and in general perform any act or function which may be useful in developing, improving, or increasing the commerce, both foreign and domestic, of the ports of the Commonwealth." Va. Code Ann. § 62.1–132.3. VPA maintains its main offices at 101 West Main Street, Suite 600 Norfolk, VA 23510

3.       Defendant Stephen Edwards ("Defendant Edwards" or "Edwards"), is the Chief Executive Officer and Executive Director of VPA, in which role he is responsible for the broad programmatic areas of business and relationship development, infrastructure development, strategic marketing, economic development, finance, security, and safety. He is being sued in his official capacity as CEO and Executive Director of VPA.

## JURISDICTION

4.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this lawsuit raises questions of federal law. Specifically, this case involves a question as to whether Defendant Edwards' application of VPA's enabling statute, Va. Code Ann. § 62.1-128., *et seq.*, in order to interfere with a private labor relations dispute under a private collective bargaining agreement is preempted by the National Labor Relations Act ("NLRA") 29 U.S.C. §151, *et seq.*, by operation of Article VI, Clause 2, of the United States Constitution (the "Supremacy Clause").

5. This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

6. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because Defendant Virginia Port Authority resides in this District, is subject to personal jurisdiction in this District, and because a substantial part of the claims arose and injuries occurred in this District.

## FACTUAL ALLEGATIONS

7. VPA is authorized by statute "to promote the shipment of goods and cargoes through the ports, . . . seek to secure necessary improvements of navigable tidal waters within the Commonwealth, and in general perform any act or function which may be useful in developing, improving, or increasing the commerce, both foreign and domestic, of the ports of the Commonwealth." Va. Code Ann. § 62.1–132.3.

8. VPA is further authorized to "acquire, construct, maintain, equip, and operate marine terminals, port facilities, wharves, docks, ships, piers, quays, elevators, compressors, refrigeration storage plants, warehouses, and other structures necessary for the convenient use of the same in the aid of commerce." Va. Code Ann. § 62.1-132.18.

9. VPA operates the day-to-day business of the marine cargo terminals in the Port of Viriginia through a separate, independent legal entity know as Virginia International Terminals, LLC ("VIT"), which is a single-member limited liability company with VPA as its sole member.

10. According to VPA's 2024 Annual Comprehensive Financial Report, 97% of VPA's operating revenue originates from VIT. This amounts to nearly $800 million in operating revenue.

11. VPA owns and, through VIT, operates four general cargo facilities: Norfolk International Terminals, Portsmouth Marine Terminal, Newport News Marine Terminal and the

Virginia Inland Port in Warren County. VPA also leases marine terminal space at the Port of Virginia, including Virginia International Gateway and Richmond Marine Terminal.

12. VPA, its Board of Commissioners, Defendant Edwards, and VIT, work collectively to promote, develop, and increase commerce at the Port of Virginia, which, in some cases, means trying to lure marine cargo away from the other competing ports along the Eastern Seaboard and Gulf Coast.

13. VPA and VIT are parties to an Operating Agreement between the two entities, which gives VIT primary responsibility for the management and operation of the public terminals of the Port of Virginia.

14. According to the Operating Agreement, VIT's Board of Directors is appointed by VPA Board of Commissioners, and VIT's budget is approved by both VIT and VPA Boards.

15. VPA created VIT specifically to administer the daily operations of the marine terminals at the Port of Virginia. The creation of VIT was deemed necessary under state law because Section 40.1-57.2 of the Virginia Code prohibits state agencies from recognizing "any labor union or other employee association as a bargaining agent of any public officers or employees, or to collectively bargain or enter into any collective bargaining contract with any such union or association or its agents." Va. Code § 40.1-57.2.

16. Upon information and belief, the creation of VIT was prompted by VPA's acknowledgement that the vast majority of containerized marine cargo is carried to the East Coast by international cargo carriers that have a collective bargaining relationship with the coastwide bargaining unit that is represented by the ILA. If the Port of Virginia wanted to capture containerized cargo away from other East Coast ports, the Port of Virginia needed a marine

terminal operator that could employ members of the collective bargaining unit represented by the ILA.

17. VIT acts as the record employer for the longshore workers and other maritime workers who are in the coastwide bargaining unit represented by the ILA. None of these workers are employed by VPA.

18. Thus, VIT is an "employer," as that term is used within the purview of the NLRA, 29 U.S.C. § 152(2).

19. VPA is not an "employer" as that term is defined by the NLRA because it is an instrumentality of the Commonwealth of Virginia.

20. VIT is an employer-member of the United States Maritime Alliance Ltd. ("USMX"), which is a multi-employer management group that is comprised of ocean carriers, marine terminal operators, port associations, and stevedores.

21. Together with the ILA, USMX acts on behalf of the employers to negotiate and administer the coastwide multi-port, multi-employer collective bargaining agreement, known as the "Master Contract," that governs the terms and conditions of employment for longshore workers and related crafts in the coastwide bargaining unit from Maine to Texas and beyond.

22. Any employer that becomes a member of USMX subscribes to the terms and conditions of the Master Contract, including, but not limited to, wages, hours, fringe benefits, workplace safety, and workforce protections.

23. VIT is a signatory to the Master Contract and participated in the negotiations for the current Master Contract.

24. VPA is not and, according to Section 40.1-57.2 of the Virginia Code, cannot be a signatory to the Master Contract.

25. The current Master Contract is in effect for the period from October 1, 2024, through September 30, 2030.

26. Negotiations for the current Master Contract were contentious and resulted in a four-day strike at the beginning of October 2024. However, the bargaining parties came to an agreement at last, and the new Master Contract was ratified and then signed by the parties on March 11, 2025.

27. One of the most contentious items of negotiation was the discussions around workforce protections regarding the implementation of new technology and automated equipment.

28. Upon information and belief, during Master Contract negotiations, VPA, through VIT, argued vociferously against more stringent workforce protections for ILA labor related to the implementation of new technology.

29. Upon information and belief, VIT's argument during contract negotiations in favor of automation and against workforce protection was at the behest of Defendants VPA, in general, and Defendant Edwards, in particular.

30. Upon information and belief, Defendant Edwards collaborated with representatives of VIT regarding the terms and conditions of employment at the Port of Virginia to prepare for collective bargaining negotiations and, more specifically, directed VIT as to which positions it should be taking in the context of collective bargaining with the ILA, even though VPA is not and cannot be a party to any collective bargaining agreement by virtue of Section 40.1-57.2 of the Virginia Code.

31. Nevertheless, despite VPA's arguments in negotiations, the new Master Contract ended up with increased protections for the implementation of new technology and semi-automated equipment.

32. Article XI of the Master Contract sets forth processes, procedures, and assurances for implementing new technology and workforce protections for ILA labor.

33. Article XI, Section 1, of the Master Contract states, in pertinent part, as follows:

> (a) Management in partnership with the ILA shall protect the Master Contract workforce for the term of this Master Contract while improving safety, productivity, efficiency and capacity on the terminals.
>
> . . .
>
> (c) No new technology will be implemented until the parties mutually agree to manning levels and workforce protections or upon completion of the below procedure listed in Section 4 of this Article XI.
>
> . . .
>
> (e) The parties acknowledge that prior to the purchase of any equipment, software, or hardware that is subject to this Article, the requirements of Section 4 of this Article XI must be completed.

34. Article XI, Section 3 of the Master Contract dictates the contractually guaranteed workforce protection guidelines and states as follows:

> (a) The following guidelines shall be followed for instituting workforce protections:
>
> (i) Define the types of technology and the effects on safety, productivity, efficiency, and capacity on the terminals;
>
> (ii) Determine the manning for the new technology;
>
> (iii) Identify the new work created by the technology by craft;
>
> (iv) Determine the process change created by the new technology within each craft subject to approval by the New Technology Committee; and
>
> (v) Provide necessary training.
>
> (b) In order to protect the workforce, there must be a determination of the number of positions affected (head count), rate of pay (Master Contract wages), and similar Master Contract hours in remaining or new Master Contract positions.

35. Article XI, Section 4 establishes a specific and thorough review process prior to the implementation of new technology, beginning with an employer notifying the Co-Chairmen of the New Technology Committee in writing of the employer's intentions for implementing new technology. The implementing employer is also obligated to notify the ILA local unions in the port where the technology will be prospectively implemented of their intentions, and both the implementing employer and the ILA locals shall engage in local negotiations.

36. As the new Master Contract has gone into effect coastwide, the Port of Virginia has been the most resistant to complying with the new technology provisions when compared to every other port on the East and Gulf Coasts of the United States from Maine to Texas. Again, the ILA and its affiliated local unions have been informed and believe that this resistance is being directed by Defendant VPA, in general, and Defendant Edwards, in particular.

37. Specifically, upon information and belief, it is Defendants VPA and Edwards that are directing VIT to violate the terms of the Master Contract by implementing new technology without following the procedures that VIT is contractually-obligated to follow.

38. For example, in April 2025, members of the ILA local unions observed that newly-purchased semi-automated rail-mounted gantry ("RMG") cranes were being set up and installed on the North Berth of the Norfolk International Terminal without any prior notice to the ILA and without any opportunity to bargain, as required by the Master Contract.

39. When the ILA local unions confronted VIT about the evident purchase of new, semi-automated RMGs in violation of the Master Contract, VIT said that the cranes had been purchased by VPA, not VIT. VIT contended that because VPA was not a party to the Master Contract, VPA had no obligation to abide by Article XI of the Master Contract.

40. The ILA has repeatedly raised concerns and filed contractual grievances against VIT about this purchase, installation and implementation of semi-automated technology in violation of the Master Contract, but VIT has consistently argued that it is unable to comply with its contractual obligations because it is VPA—not VIT—that was purchasing, installing, and implementing of all new equipment, such as semi-automated stacking cranes, semi-automated cantilever RMG cranes, and semi-automated RMG cranes.

41. Most recently, the ILA and its affiliated local unions in Virginia filed a grievance related to newly acquired RMGs cranes at Norfolk International Terminal. Again, VIT's response was that VPA was the party that had purchased this new semi-automated equipment at VIT's terminal.

42. Taking VIT at its word, it is clear that Defendant VPA is using its statutory authority to inserting itself into and interfere with a private-sector collective bargaining relationship.

43. VPA is purchasing new technology for VIT so that VIT can avoid its contractual obligations to bargain about the purchase and implementation of new technology. This situation causes VIT to violate its obligations under the Master Contract. Thus, VPA is using its authority to frustrate the collective bargaining process and interfere with the Master Contract and relationship between ILA and VIT.

## COUNT I

### DECLARATORY JUDGMENT

### THE NLRA PREEMPTS VPA'S EFFORTS TO INTERFERE WITH COLLECTIVE BARGAINING AND THE ADMINSTRATION OF THE MASTER CONTRACT

44. Plaintiff hereby repeats the allegations contained in Paragraphs 1-43, as if set forth at length herein.

45. VIT and the ILA are parties to the Master Contract, which establishes the terms and conditions of employment for longshoremen, clerks, checkers, and maintenance employees employed in container and roll-on/roll- off ("ro-ro") operations at ports across the East and Gulf Coasts of the United States.

46. Defendant VPA is an instrumentality of the Commonwealth of Virginia that wants VIT to implement new technology in violation of the Master Contract and has been acquiring new semi-automated equipment and installing it on VIT's terminals without regard to the provisions agreed to in the Master Contract.

47. VPA and Edwards are aware of the terms and conditions of the Master Contract, specifically as they relate to the specific processes, procedures, and assurances for implementing new technology, as well as the workforce protections guaranteed to ILA labor.

48. Yet, despite their knowledge of the terms and conditions of the Master Contract, VPA and Edwards have knowingly and intentionally interfered with the contract between VIT and ILA by causing VIT to violate that contract.

49. VPA and Edwards facilitated and approved the purchase of semi-automated stacking cranes, semi-automated cantilever RMG cranes, and semi-automated RMG cranes, and forced or required VIT to use these cranes, thereby causing VIT to breach the obligations it agreed to in Article XI of the Master Contract.

50. VPA and Edwards are acting pursuant to VPA's enabling statue, Va. Code Ann. § 62.1-128, *et seq.*, which gives VPA wide latitude to "perform any act or function which may be useful in developing, improving, or increasing the commerce, both foreign and domestic, of the ports of the Commonwealth." Va. Code Ann. § 62.1–132.3.

51. However, the wide latitude given to VPA under Virginia law is not so wide as to allow interference with collective bargaining rights that are regulated and protected by federal law. To the extent that VPA is acting in a manner that interferes with the ILA's collective bargaining rights, in a manner that forces VIT to violate its obligations under the Master Contract, or in a manner that frustrates the Master Contract's grievance and dispute resolution procedures, then Edwards' and VPA's interpretation and application of Virginia law is preempted by the NLRA.

52. The Congressional intent of the NLRA was to insulate labor relations from governmental outside forces by ensuring "that employers and their employees could work together to establish mutually satisfactory conditions ... [without] the Government ... becom[ing] a party to the negotiations and impos[ing] its own views of a desirable settlement." *H.K. Porter Co. v. N.L.R.B.*, 397 U.S. 99, 103-104 (1970).

53. Prohibited government involvement can be as subtle as an attempt to "induce or encourage" because the Court construes these terms "broad [ly] enough to include ... every form of influence and persuasion." *Int'l Bhd of Elec. Workers, Local 501 v. N.L.R.B.*, 341 U.S. 694, 701–02, n.7 (1951).

## COUNT II
## PERMANENT INJUNCTION

54. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 43, as if fully set forth herein.

55. As demonstrated above, Plaintiff ILA will be successful on the merits of its preemption claims.

56. Plaintiff ILA will be immediately and irreparably harmed without the entry of a permanent injunction enjoining Defendant Virginia Port Authority from interfering with the Master Contract.

57. The ILA has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that judgment be entered in favor of Plaintiff and against Defendants as follows:

A. Declaring that Defendants' attempt to frustrate and to interfere with the collective bargaining process between the ILA and VIT is preempted by federal labor law;

B. Permanently enjoining Defendant VPA and Defendant Edwards from any interference with collective bargaining or the administration of the Master Contract, including, but not limited to, causing VIT to violate the new technology and workforce protection provisions of Article XI of the multi-port, multi-employer USMX-ILA Master Contract; and

C. A permanent injunction prohibiting Defendant VPA and Defendant Edwards from interfering with the grievance and dispute resolution procedures of the Master Contract.

D. For such further relief as the Court may deem equitable and just.

## JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Dated: August 26, 2025

Respectfully submitted,

_____
Justin P. Keating (VA Bar 75880)
BEINS, AXELROD & KEATING, P.C.
1800 Diagonal Rd., Suite 600
Alexandria VA 22314
(703) 966-3193

jkeating@beinsaxelrod.com

John P. Sheridan (*pro hac vice* pending)
Brian Jasinski (*pro hac vice* pending)
MAZZOLA MARDON, P.C.
39 Broadway, 34th Floor
New York, New York 10006
(212) 425-3240

**COUNSEL FOR PLAINTIFF
INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION**