# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA,
### Norfolk Division

| | | |
|---|---|---|
| INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2:25cv523-JKW-RJK |
| VIRGINIA PORT AUTHORITY, et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

Plaintiff International Longshoremen's Association ("Plaintiff" or "ILA") submits this memorandum of law in opposition to Defendants' motion to dismiss the Complaint filed by Defendants Virginia Port Authority ("VPA") and Stephen Edwards ("Edwards"), pursuant to Rules 12(b)(1), 12(b)(6), and 12(b)(7).

## INTRODUCTION

Defendants' arguments repeatedly mischaracterize the premise of Plaintiff's detailed Complaint for declaratory and injunctive relief arising out of Defendants' ongoing interference with the ILA's multi-port, multi-employer collective bargaining agreement (*i.e.*, the "Master Contract"), as well as the ILA's federally protected collective bargaining rights under the National Labor Relations Act ("NLRA"). Defendants repeat various fallback arguments that sometimes contradict each other: for example, characterizing the ILA's lawsuit as a claim for breach of contract but also a request for advisory opinion, neither of which is correct.

1003-656
148850

Despite what Defendants try to argue, the Complaint clearly alleges sufficient facts detailing Defendants' deliberate and intentional thwarting of the ILA's collective bargaining rights by purchasing and installing new semi-automated cargo-handling equipment on behalf of VPA's private alter ego, Virginia International Terminals, LLC ("VIT"), in order to assist VIT in evading the rules that VIT agreed to when it signed the Master Contract.

**STATEMENT OF FACTS**

The full facts and circumstances surrounding Plaintiff's claims concerning Defendants' interference with their federally protected rights under the NLRA are set forth in Plaintiff's Complaint (Dkt. No. 1), which is incorporated herein by reference.

**ARGUMENT**

**I.**

**LEGAL STANDARDS**

**A.      Rule 12(b)(1) of the Federal Rules of Civil Procedure**

A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a court's jurisdiction over the subject matter of the suit. *See Graves v. Foulger-Pratt Companies, LLC*, No. 21 Civ. 1367 (MSN)(WEF), 2023 WL 2720795, at *4 (E.D. Va. Mar. 30, 2023). Where a Rule 12(b)(1) motion attacks the complaint on its face and asserts that the complaint fails to state a claim upon which subject matter jurisdiction can lie, a court assumes the truth of the facts alleged by the plaintiff, thereby functionally affording the plaintiff the same procedural protection that it would receive under Rule 12(b)(6) consideration. *See Int'l Longshoremen's Ass'n, Local 1624 v. Va. Int'l Terminals*, 914 F. Supp. 1335, 1338 (E.D. Va. 1996). In this case, Defendants submitted their 12(b)(1) motion without any affidavits or documentary evidence, so this is the standard that applies here.

1003-656
148850

2

Finally, "where a party challenges the subject matter jurisdiction of the court on the grounds that the party is an arm of the state entitled to sovereign immunity, the burden of persuasion lies with the party asserting the immunity." *Hutto v. S.C. Ret. Sys.*, 899 F. Supp. 2d 457, 466 (D.S.C. 2012) (citing *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006)).

**B.      Rule 12(b)(6) of the Federal Rules of Civil Procedure**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth "a claim for relief that is plausible on its face." *Schafer v. Citibank, N.A.*, No. 10 Civ. 10 (GBL), 2010 WL 9034653, at *3 (E.D. Va. Aug. 3, 2010) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *aff'd*, 447 F. App'x 466 (4th Cir. 2011). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Tapia v. U.S. Bank, N.A.*, 718 F. Supp. 2d 689, 694 (E.D. Va. 2010) (*quoting Iqbal*, 556 U.S. at 678), *aff'd*, 441 F. App'x 166 (4th Cir. 2011).

A Rule 12(b)(6) motion does not resolve contests surrounding the facts or the merits of a claim. *See Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Nor does a complaint need to be factually comprehensive. *See Coleman v. Md. Ct. of Apps.*. 626 F.3d 187, 190 (4th Cir. 2010) (a complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests").

Finally, in ruling on a 12(b)(6) motion, a court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (internal quotation marks omitted); *see also E.I. Du Pont Demours and Company v. Kolon Indus. Inc.*, 637 F.3d 435 (4th Cir. 2011) (when ruling on a Rule 12(b)(6) motion to dismiss, "a judge

must accept as true all of the factual allegations contained in the complaint"); *Nemet Chevrolet Ltd. v. Consumeraffairs.com. Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) ("like the district court, [we] draw all reasonable inferences in favor of the plaintiff").

## C.    Rule 12(b)(7) of the Federal Rules of Civil Procedure

A motion under Rule 12(b)(7) requires showing that a necessary party under Rule 19 is absent and that their absence impairs the court's ability to accord complete relief or prejudices existing parties.  *See* Fed. R. Civ. P. 12(b)(7).  Courts are reluctant to grant the "drastic remedy" of dismissal on 12(b)(7) motions.  *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Rite Aid of S.C.*, Inc., 210 F.3d 246, 250 (4th Cir. 2000).  The burden lies on the moving defendant to demonstrate that a party must be joined for a just adjudication.  *See Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005).

## II.

## DEFENDANTS' PRELIMINARY ARGUMENTS IGNORE THE ACTUAL ALLEGATIONS IN THE COMPLAINT

In addition to their main arguments, Defendants use a scattershot approach of throwing out various procedural deficiencies to see if anything sticks.  The ILA will address these arguments first since most of them are premised upon ignoring the substance of the ILA's actual allegations.

## A.    The ILA Has Standing

Defendants first argue that the ILA lacks standing to sue since the ILA supposedly did not allege any harm in its Complaint because either the purchased equipment has not yet been implemented or no financial injury has occurred. (Defs.' Br., p. 12-13).  In making this argument Defendants either ignore what the ILA has specifically alleged or misconstrue what is necessary for standing.

To meet the "case-or-controversy" requirement of Article III, a plaintiff must establish standing. *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). To establish standing, a plaintiff must show, that "(1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (*quoting Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). To demonstrate an injury-in-fact, a plaintiff is required to show that it has a legally cognizable interest that has been or is imminently at risk of being invaded. *Lujan*, 504 U.S. at 560. Likewise, when the plaintiff who is challenging a governmental action is "an object of the action (or foregone action) at issue . . . there is little question" that the plaintiff has been injured. *Lujan*, 504 U.S. at 560-61. "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," *Warth v. Seldin,* 422 U.S. 490, 500 (1975); instead, it "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated," *Flast v. Cohen*, 392 U.S. 83, 99 (1968).

Furthermore, a plaintiff need not allege monetary harm to support the injury-in-fact requirement, as the Supreme Court has recognized injuries based on things, such as recreation, aesthetics, electoral districts, and unfair competition. *See, e.g.*, *Laidlaw*, *supra*; *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993);

*U.S. v. Hays*, 515 U.S. 737, 744-745 (1995); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (explaining that "intangible injuries can . . . be concrete").

Contrary to Defendants' contentions, the ILA has adequately pled that Defendants are deliberately thwarting the ILA's federally protected right (under Section 7 of the NLRA) to engage in collective bargaining without state interference, as well as its rights under the Master Contract. 29 U.S.C. § 157; *see Bldg. and Const. Trades Dept. v. Allbaugh*, 172 F. Supp. 2d 67, 75 (D.D.C. 2001) (union had legally protected interest in negotiating and enforcing its contract). Specifically, the ILA has clearly alleged that that Defendants intentionally purchased equipment so that VIT could evade its contractual obligation to notify the ILA **before** purchasing such equipment. Compl., ¶ 33, 38-39. Thus, the ILA has adequately pled that Defendants have conspired with VIT to deliberately manipulate VPA's statutory authority to undermine the ILA's federally protected rights under the NLRA.

**B.    The ILA's Claims Are Ripe for Adjudication by This Court**

Next, Defendants argue that the ILA's claim for alleged breach of contract is not "ripe." But the ILA is not bringing a claim for breach of contract. The ILA is seeking declaratory and injunctive relief. *See* 28 U.S.C. § 2201-2202.[1] Whether or not VIT is legally "in breach" of the Master Contract is irrelevant. The ILA, instead, alleges that VPA's ongoing practice of deliberately purchasing equipment before VIT has first negotiated with the ILA in accordance with its contractual obligations is preempted by federal labor law.

---

[1] Defendants also argue, confusingly, that the ILA does not specify any legal basis for bringing this action, but the Complaint clearly states that it is being brought under the Declaratory Judgment Act, as Defendants specifically acknowledge--and argue against--in another section of their brief. *See* 28 U.S.C. § 2201, *et seq.*

1003-656
148850

6

Likewise, Defendants contend that the Court should not rule on a "hypothetical" state of facts, but their own brief belies this argument. The ILA's Complaint says that Defendants are preempted from purchasing semi-automated equipment unless and until VPA's private alter ego has fulfilled its obligations under the Master Contract, but Defendants argue that they have a "statutory duty" to continue making such purchases. (Defs' Br., p 13). There is clearly an actual controversy that requires resolution.

Defendants further argue that the controversy is not ripe because the ILA's Complaint only alleges that the new equipment has been purchased but not yet "implemented." Defs.' Br., pp. 13-14. But, notably, the Complaint alleges that the ILA must be given notice and an opportunity to bargain **prior to the purchase** of any new equipment. Compl., ¶ 33. Regardless, the Complaint also alleges that the new equipment is currently being **implemented**. Compl., ¶¶ 38-43.

**C.    An Injunction Is Not a "Claim" That Can Be Dismissed
Under 12(b)(6), It Is Form of Relief That May
Be Available after Presentation of the Evidence**

In their brief, Defendants contend that "[t]he Complaint makes no attempt to allege facts to support a claim of irreparable injury, inadequate remedy at law, balance of hardships, or the public interest." Defs.' Br., p. 22. However, as alleged in the Complaint, without this Court's intervention, the ILA has no other available remedy at law to prevent Defendants from continuing to interfere with the terms and conditions of the Master Contract. As a public entity, VPA – along with Edwards – has been deliberately trying to influence the negotiation and administration of the Master Contract knowing that, unlike a private employer, it cannot be brought before the NLRB by way of an unfair labor practice charge or sued in this Court pursuant to a single-employer theory under Section 301 of the NLRA.

As a threshold matter, Defendants have moved to dismiss the ILA's Complaint under Rule 12(b)(6), which analyzes whether a pleading states a **claim** upon which relief can be granted. An injunction is not a claim or a cause of action—it is one form of relief that can be granted to a prevailing plaintiff. *See Bloch v. Executive Office of the President*, 164 F. Supp. 3d 841, 862 (E.D. Va. 2016) ("injunctive relief is a remedy and not a cause of action"); *Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp. 2d 678, 682 n.1 (D. Md. 2001) ("a request for injunctive relief does not constitute an independent cause of action; rather, the injunction is merely the remedy sought for the legal wrongs alleged. . ..").

In this instance, the ILA seeks a narrow injunction permanently enjoining Defendants from the unilateral purchase or acquisition of semi-automated cargo-handling equipment unless and until VPA's private alter ego has fulfilled all its contractual obligations. Port development is an ongoing endeavor, and Defendants will likely continue to purchase equipment that violates the Master Contract and compel VIT to employ it. Accordingly, the ILA seeks this Court's intervention to enjoin Defendants' interference with its collective bargaining rights under the Master Contract and federal labor law.

### III.

### DEFENDANTS ARE NOT AFFORDED SOVEREIGN IMMUNITY

A.    **Under the Fourth Circuit's Factual Analysis,**
      **VPA IIs Not An "Arm of the State"**

Defendants' argument is entirely premised on their supposition that any state-created entity is **automatically** entitled to the protection of sovereign immunity, but that is simply not the law. Notably, Defendants cite no case that has held that VPA is entitled to Eleventh Amendment immunity.

1003-656
148850

8

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. While this protection extends also to "arms of the State" (*Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001)) (citations omitted), not every entity created by the state is shielded by this immunity. *See Moor v. Cnty. of Alameda*, 411 U.S. 693 (1973); *see also Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 248 (4th Cir. 2012).

The ultimate question with regard to a state-created entity is whether the state is the real party in interest. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). Therefore, when examining a state-created entity, a court must first examine the relationship between the state and the entity to determine whether it should be considered an "arm of the State." *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). Indeed, this Court has previously conducted this factual inquiry for the VPA but ultimately declined to issue a definitive ruling on the issue. *Love v. Virginia Port Auth.*, 16 Civ. 160, 2017 WL 10181010, at *4-5 (E.D. Va. Aug. 11, 2017).

The Fourth Circuit has articulated a factual inquiry based on four (4) non-exclusive factors (the "Immunity Factors") when determining whether a state-created entity is an "arm of the State." *See S.C. Dep't of Disabilities and Special Needs v. Hoover Universal Inc.*, 535 F.3d 300, 303 (4th Cir. 2008); *see also Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005); *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456 (4th Cir. 1987); *Love*, 2017 WL 10181010, at *4-5 (citing *U.S. ex rel Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 650-51 (4th Cir. 2015)) ("*Oberg III*"). The Immunity Factors are:

      (i)     Whether any judgment against the entity as defendant will be paid by the State;

      (ii)    The degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;

      (iii)   Whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and

      (iv)   How the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

When reviewing the factual allegations in this Complaint, it is clear why the VPA should **not** be afforded Eleventh Amendment immunity. Regardless, such a fact-intensive inquiry cannot be fully resolved at this stage before any factual record has been developed.

### 1. The Complaint Clearly Alleges that No Judgment Will Be Paid by the Commonwealth of Virginia

Although the Supreme Court has never issued a comprehensive guideline, arguably the most important factor to consider is whether the primary legal liability for a judgment against VPA would fall upon the Commonwealth of Virginia and, in turn, whether an award for damages, if any, would come out of the state treasury. *See Doe*, 519 U.S. at 428 (1997); *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994). If the state would have to pay for damages from the state treasury, then the Eleventh Amendment would serve as a shield from liability.

However, since the ILA is seeking declaratory and injunctive relief—not damages—its request for relief has no bearing on the state treasury. Even if the ILA sought damages, the allegations in the Complaint tend to indicate that the Commonwealth of Virginia would probably not pay any judgment rendered against VPA because, "[a]ccording to VPA's 2024 Annual Comprehensive Financial Report, 97% of VPA's operating revenue originates from VIT. This

amounts to nearly $800 million in operating revenue." Compl., ¶ 10.  As such, there are sufficient allegations on this first factor, which, if proven by evidence, will militate against VPA having immunity from suit in this Court.

### 2.    The Complaint alleges how VPA Exercises Autonomy over Operations at the Port of Virginia

The second Immunity Factor that must be analyzed is the degree of autonomy exercised by the entity from the Commonwealth.  This independence may be measured by evaluating certain sub-factors, such as determining who appoints the entity's directors or officers, how the entity is funded, the entity's ability to enter contract, and whether the entity is represented in legal matters by the state attorney general.  *See Oberg III, supra; see also Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 580 (4th Cir. 2014) ("*Oberg I*").

As discussed above, VPA is funded by VIT to the tune of nearly $800 million.  This accounts for 97% of VPA's operating revenue and allows VPA to operate free of state subsidy.

Furthermore, as Plaintiff alleged in its Complaint, "VPA is authorized by statute 'to promote the shipment of goods and cargoes through the ports . . . and in general perform any act or function which may be useful in developing, improving, or increasing commerce.'"  Compl., ¶ 7 (*quoting* Va. Code Ann. § 62.1-132.3).  Likewise, "VPA is further authorized to 'acquire, construct, maintain, equip, and operate marine terminals, port facilities, wharves, docks, ships, piers, quays, elevators, compressors, refrigeration storage plants, warehouses, and other structures necessary for the convenient use of the same in the aid of commerce."  *Id.*, ¶ 8 (*quoting* Va. Code

Ann. § 62.1-132.18.  This includes entering into agreements to purchase semi-automated cargo-handling equipment at the Port of Virginia.  *Id.*, ¶¶ 37-43.

In exercising its autonomy at the Port of Virginia, "VPA owns and, through VIT, operates four general cargo facilities: Norfolk International Terminals, Portsmouth Marine Terminal, Newport News Marine Terminal, and the Virginia Inland Port in Warren County.  VPA also leases marine terminal space at the Port of Virginia, including Virginia International Gateway and Richmond Marine Terminal."  Compl., ¶ 11.  "VPA and VIT are parties to an Operating Agreement between the two entities, which gives VIT primary responsibility for the management and operation of the public terminals of the Port of Virginia."  *Id.*, ¶ 13.  "According to the Operating Agreement, VIT's Board of Directors is appointed by VPA Board of Commissioners, and VIT's budget is approved by both VIT and VPA Boards."  *Id.*, ¶ 14.

Also, "[u]pon information and belief, Defendant Edwards collaborated with representatives of VIT regarding the terms and conditions of employment at the Port of Virginia to prepare for collective bargaining negotiations and, more specifically, directed VIT as to which positions it should be taking in the context of collective bargaining with the ILA, even though VPA is not and cannot be a party to any collective bargaining agreement by virtue of Section 40.1-57.2 of the Virginia Code."  *Id.*, ¶ 30.

The last subfactor is evident here because Defendants are not being represented by the state attorney general in this case.  Thus, there are sufficient allegations on the second factor, which, if proven by evidence, will militate against VPA having immunity from suit in this Court.

1003-656
148850

12

3.    **The Complaint Alleges How VPA Acts in Its Own Interest Beyond the Commonwealth's Jurisdiction**

The third Immunity Factor considers "whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns." *Oberg I*, 681 F.3d at 580 (*quoting Hoover Universal*, 535 F.3d at 303). However, "non-state concerns" do not mean **only** "local" concerns but rather encompass other non-state interests like out-of-state operations. *See Hoover Universal*, 535 F.3d at 307 (characterizing this factor as "whether the entity is involved with statewide, as opposed to local or other non-state concerns") (emphasis added).

Here, the Virginia Code authorizes VPA "to promote the shipment of goods and cargoes, . . . and perform any act or function which may be useful in developing, improving, or increasing the commerce, **both foreign and domestic**, of the ports of the Commonwealth." Compl., ¶ 7 (*quoting* Va. Code Ann. § 62.1-132.3) (emphasis added). By nature, the marine shipping industry is a global industry and, by virtue of working to increase foreign commerce, VPA concerns itself with operations outside the Commonwealth's jurisdiction. In fact, "VPA, its Board of Commissioners, Defendant Edwards, and VIT, work collectively to promote, develop, and increase commerce at the Port of Virginia, which, in some cases, means trying to lure marine cargo away from the other competing ports along the Eastern Seaboard and Gulf Coast." *Id.*, ¶ 12. "Upon information and belief, the creation of VIT was prompted by VPA's acknowledgement that the vast majority of containerized marine cargo is carried to the East Coast by international cargo carriers that have a collective bargaining relationship with the coastwide bargaining unit that is represented by the ILA. If the Port of Virginia wanted to capture containerized cargo away from other East Coast ports, the Port of Virginia needed a marine terminal operator that could employ members of the collective bargaining unit represented by the ILA." *Id.*, ¶ 16.

Thus, there are sufficient allegations for three of the four immunity factors. The fourth factor requires more legal analysis than factual; however, Defendants have not addressed this at all in their motion. Regardless, the entire inquiry is so fact-based that it is not proper for a determination with no evidentiary record at all.

**B.    Defendant Edwards Is Not Afforded Sovereign Immunity For Ongoing Violations of the ILA's Federally Protected Rights**

As Defendants concede in their brief, the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), creates an exception to sovereign immunity that is applicable in suits for declaratory and injunctive relief against individual state officers, in order to prevent ongoing violations of federal law. *See Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a **straightforward inquiry** into whether complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* (emphasis added). As demonstrated below, the allegations in the ILA's complaint easily satisfy this "straightforward inquiry" since the ILA seeks an injunction ordering the Edwards to cease his ongoing interference with its collective bargaining rights.

However, Defendants try to argue that Edwards lacks sufficient "connection" with and "authority" over the VPA. (Defs.' Br., p. 8). This argument hardly passes the straight-face test. Defendants rely heavily on a recent decision of this Court, *Nansemond Indian Nation v. Virginia*, No. 25 Civ. 195, 2025 WL 2320358, at *1 (E.D. Va. Aug. 8, 2025). In that case, the plaintiff Indian Nation accused the Commonwealth of mismanaging administration of Medicaid payments with respect to a clinic the plaintiff operated. Plaintiff sued the Commonwealth, several agencies and several individuals including the Governor and the Secretary of State. This Court dismissed both

1003-656
148850

14

the Governor and the Secretary of State because they played absolutely no role in administering

Medicaid. *Id.* at *6. The contrast here could not be starker, where the Complaint alleges that

Defendant Edwards has plenary authority over the VPA. Compl., ¶ 3. In fact, in his professional

biography, Edwards describes himself as follows:

> He directs and manages the operations of Virginia's marine and inland terminal facilities **through Virginia International Terminals, LLC, the port's private terminal operating company**, including Virginia International Gateway, Newport News Marine Terminal, Norfolk International Terminals, Portsmouth Marine Terminal, Richmond Marine Terminal and the Virginia Inland Port.
>
> He is a globally experienced leader in the maritime industry with extensive operational experience and a proven track record of growing businesses and creating long-term value for customers and stakeholders.

*See* **Exhibit A** (emphasis added). Thus Edwards, by his own admission, directly controls

everything that happens at VPA **and** VIT.

The ILA's Complaint sets forth that, "[u]pon information and belief, Defendant Edwards

collaborated with representatives of VIT regarding the terms and conditions of employment at the

Port of Virginia to prepare for collective bargaining negotiations and, more specifically, directed

VIT as to which positions it should be taking in the context of collective bargaining with the ILA,

even though VPA is not and cannot be a party to any collective bargaining agreement by virtue of

Section 40.1-57.2 of the Virginia Code." Compl., ¶ 30. Moreover, the Complaint specifically

alleges that Edwards deliberately and intentionally interfered with the ILA's collective bargaining

rights by authorizing the purchase and acquisition of new automated equipment before VIT gave

any notice to the ILA as required by the terms of the Master Contract. *See, e.g.*, Compl., ¶¶ 29-

30. Even after the new Master Contract had gone into effect following a four-day strike, "the Port

of Virginia has been the most resistant to complying with the new technology provisions when

compared to every other port on the East and Gulf Coasts of the United States from Maine to Texas. Again, the ILA and its affiliated local unions have been informed and believe that this resistance is being directed by Defendant VPA, in general, and Defendant Edwards, in particular." *Id.*, ¶¶ 26, 36. "Specifically, upon information and belief, it is Defendants VPA and Edwards that are directing VIT to violate the terms of the Master Contract by implementing new technology without following the procedures that VIT is contractually obligated to follow." *Id.*, ¶ 37. "[D]espite their knowledge of the terms and conditions of the Master Contract, VPA and Edwards have knowingly and intentionally interfered with the contract between VIT and the ILA by causing VIT to violate that contract" (*id.*, ¶ 48) by "facilitat[ing] and approv[ing] the purchase of semi-automated stacking cranes, semi-automated cantilever RMG cranes, and semi-automated RMG cranes, and forc[ing] or require[ing] VIT to use these cranes. . . ." *Id.*, ¶ 49.

Defendants next argue that the ILA is not seeking "prospective" relief against Edwards. Defendants argue that "[t]he ILA seeks to address something that has allegedly already happened, *i.e.*, the alleged purchase of new equipment with new technology." (Defs.' Br., p. 9). However, an injunction is prospective by its very nature. The allegations about Defendants' past behavior show that they were engaged in an intentional plan to help VIT evade its contractual obligations. And since that plan has so far been successful, it is likely that Defendants' conduct will continue until that conduct is expressly prohibited. Indeed, the ILA's Complaint undeniably alleges that Defendants' conduct is currently ongoing, describing their actions in the present tense. Compl. ¶¶ 37, 40-42. Thus, the ILA's allegations are sufficient to show an ongoing scheme by both Defendants to interfere with the ILA's rights under its Master Contract. A plaintiff can establish an ongoing violation in one of two ways: "(1) proving violations that continue on or after the date the complaint is filed or (2) by adducing evidence from which a reasonable trier of fact could find

a continuing likelihood of a recurrence in intermittent or sporadic violations." *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171-72 (4th Cir. 1988). In either situation, a complete factual record is required, and, as a result, this is not an issue that can be resolved at the pre-answer stage.

## IV.

### THE ILA'S FEDERALLY PROTECTED RIGHTS UNDER THE NLRA PREEMPT DEFENDANTS' DELIBERATE INTERFERENCE WITH THE MASTER CONTRACT

As Defendants concede, the Supreme Court has articulated two distinct NLRA preemption principles. *Bldg. and Const. Trades Council of the Metro. Dist. v. Associated Builders and Contractors of Mass./Rhode Island, Inc.*, 507 U.S. 218, 224 (1993) ("*Boston Harbor*"). Each principle is the opposite side of the same coin. The first sort of preemption, "*Garmon* preemption," forbids states from attempting to control any activity that is arguably protected or arguably prohibited by the NLRA. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244 (1959); *Boston Harbor,* 507 U.S. at 224–25. The *Garmon* rule is intended to preclude state interference with the National Labor Relations Board's ("NLRB") interpretation and active enforcement of the "integrated scheme of regulation" established by the NLRA. *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 289 (1986); *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 613–14 (1986); *see Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 748 n. 26 (1985).

The second type, "*Machinists* preemption," prohibits state interference in areas that have been left to be controlled by the free play of economic forces. *Boston Harbor,* 507 U.S. at 225; *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 140 (1976). This type of pre-emption holds that State action may not interfere with "Congress' intentional balance between

1003-656
148850

the uncontrolled power of management and labor to further their respective interests" within the collective bargaining process. *Boston Harbor,* 507 U.S. at 226. In this case, Defendants' actions are preempted under both principles.

First, *Garmon* preemption applies because Defendants' conduct is prohibited by the NLRA for any private employer. Defendants argue that they can act with impunity simply because NLRB charges may not be brought against them, but that is not how preemption works. Defendants state the obvious fact that VPA is a public entity and, as such, it is not subject to the NLRA (*see* Defs.' Br., pp. 16-17). Defendants then observe that the ILA has not tried to bring the instant dispute as a charge before the NLRB, from which Defendants conclude that *Garmon* preemption simply cannot apply to them. (Defs.' Br., p. 20). But the fact that Defendants are not covered by the NLRA is precisely the reason their conduct is preempted. Edwards has used VPA to help VIT evade its contractual obligations in a way that he could not have done if VPA and VIT were private corporate affiliates that were both subject to the jurisdiction of the NLRB. Defendants know that if VPA was a private employer, it could be brought before the NLRB by way of an unfair labor practice charge or sued in this Court as VIT's "alter ego" or "single employer" under Section 301 of the NLRA. *See Radio & Tel. Broad. Technicians, Local 1264 v. Broad. Serv. of Mobile*, Inc., 380 U.S. 255, 256 (1965) ("single employer" analysis for binding corporate affiliates to the terms of a collective bargaining agreement); *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942) (alter ego status can bind a non-signatory corporate affiliate to a collective bargaining agreement). If the NLRA forbids private parties from engaging in certain conduct, then it follows that state agencies are preempted from engaging in the exact same misconduct. *See Gould Inc.*, 475 U.S. at 287 ("there can be little doubt that the NLRA would prevent Wisconsin from forbidding private parties

within the State to do business with repeat labor law violators," therefore the state was preempted from enforcing a similar prohibition against state agencies).

Likewise, *Machinists* preemption also applies to the Defendants' actions because the rationale behind *Machinists* preemption is to prevent state government from putting its finger on the scale in an attempt to increase bargaining power for either labor or management. *See Golden State Transit*, 475 U.S. at 614 (state interference in collective bargaining was preempted when it "thwarted" the bargaining process). "It is apparent from the legislative history of the whole Act that the policy of Congress is to impose a mutual duty upon the parties to confer in good faith with a desire to reach agreement, in the belief that such an approach from both sides of the table promotes the overall design of achieving industrial peace. . . . But apart from this essential standard of conduct, Congress intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences." *NLRB v. Ins. Agents' Int'l*, 361 U.S. 477, 488 (1960) (citations omitted). Here, the ILA has alleged that Defendants Edwards and VPA knowingly undermined the collective bargaining process by deciding that VIT could evade contractual consequences by having certain prohibited actions performed by VIT's alter ego. Obviously, when VIT agreed to rules that it knew VPA would help subvert, VIT was not bargaining in good faith, and the contentious negotiations and strike that preceded the contract were essentially rendered meaningless. VIT was able to settle the strike and the contract under false pretenses, knowing that Defendants would be able to assist VIT in evading its contractual obligations. Likewise, when Edwards and VPA deliberately used their state-granted authority to subvert the contractual protections that the ILA had fought for, they

1003-656
148850

19

were undercutting the ILA's bargaining power and thwarting the balance that Congress intended for collective bargaining.

Specifically, the Complaint alleges that, during the long and contentious negotiations, VIT argued at Defendants' behest against new rules requiring VIT to provide notice to the ILA before purchasing or acquiring automated equipment. *See* Compl., ¶¶ 28-30 (emphasis added). Ultimately, the bargaining parties finalized a new collective bargaining agreement in March 2025, which included the new rules to which Defendants objected. *See id.*, ¶¶ 31-35:

> (e) The parties acknowledge that prior to the purchase of any equipment, software, or hardware that is subject to this Article, the requirements of Section 4 of this Article XI must be completed.

*Id.*, ¶ 33.

Furthermore, the ILA alleges that, despite these new provisions, the ILA's local unions in Virginia "observed that newly-purchased semi-automated rail-mounted gantry ('RMG') cranes were being set up and installed on the North Berth of the Norfolk International Terminal without any prior notice to the ILA and without any opportunity to bargain, as required by the Master Contract." *Id.*, ¶ 38. When the ILA confronted VIT about this apparent violation of the Master Contract, VIT responded that the RMG cranes had not been purchased by VIT but, instead, had been purchased by VPA. "VIT contended that because VPA was not a party to the Master Contract, VPA had no obligation to abide by Article XI of the Master Contract." *Id.*, ¶ 39.

Defendants then argue that VPA's grant of authority under the Virginia Code is "not related to the collective bargaining process or labor relations" (Defs.' Br., p. 21). But that is not something that is required for preemption. *Golden State Transit*, 475 U.S. at 618 ("The city contends it was not regulating labor, but simply exercising a traditional municipal function in issuing taxicab franchises. We recently rejected a similar argument to the effect that a State's spending decisions

are not subject to pre-emption.") (citing *Gould Inc.,* 475 U.S. at 287–288*; Metropolitan Life Ins.,* 471 U.S. at 754–755.  Indeed, both the Supreme Court and lower federal courts routinely hold that all sorts of decisions and actions—and even inaction--by public agencies and public officials may be held preempted.  *Golden State Transit*, 475 U.S. at 618 (1986) (Los Angeles was pre-empted from conditioning Golden State's franchise renewal on the settlement of labor dispute); *Rum Creek Coal Sales, Inc. v. Caperton*, 971 F.2d 1148, 1154 (4th Cir. 1992) ( "neutrality statute" as interpreted and applied by state police was preempted under *Machinists* and *Golden State* because police inaction interfered with employer's rights under NLRA); *Amalgamated Transit Union, Div. 819 v. Byrne*, 76 Civ. 2050, 1977 WL 4289, at *2 (3d Cir. Feb. 15, 1977) (threat by New Jersey state officials to withdraw state subsidies was deemed impermissible interference with collective bargaining process between unions and transit companies and, thus, preempted by NLRA); *Oil, Chemical and Atomic Workers v. Ark. La. Gas Co.,* 332 F.2d 64 (10th Cir. 1964) (state-sanctioned investigation, for the purpose of making and publishing findings and recommendations to the end of bringing the pressure of public opinion to force settlement is prohibited state interference with the voluntary collective bargaining process); *New England Health Care, Employees Union, Dist. 1199, SEIU v. Rowland*, 221 F. Supp. 2d 297, 338 (D. Conn. 2002) (prepaying Medicaid subsidies to nursing homes favored one party in labor-management dispute and therefore was preempted because it was not an acceptable method to impose state budgetary policies); *Del. Coach Co. v. Pub. Serv. Comm'n of State of Del.*, 265 F. Supp. 648, 650 (D. Del. 1967) (during bus strike, court enjoined the public commission's planned hearing to revoke company's certificate of public convenience because action was intended to influence collective bargaining); *Cab Operating Corp. v. City of New York*, 243 F. Supp. 550 (S.D.N.Y. 1965) (city's attempt to conduct a poll in order to mold public opinion so as to bring pressure to bear on the parties was preempted)*;*

1003-656
148850

21

*Rochester Tel. Corp. v. Levine*, 1975 WL 1186, at *3 (W.D.N.Y. Apr. 3, 1975) (state investigation into labor dispute would constitute state action in direct conflict with the federal policy favoring free and uncoerced collective bargaining); "Prohibited government involvement can be as subtle as an attempt to 'induce or encourage' because the Court construes these terms 'broad[ly] enough to include . . . every form of influence and persuasion.'" *Grain Processing Corp. v. Culver*, 708 F. Supp. 2d 859, 865 (S.D. Iowa 2010) (*quoting Int'l Bhd. of Elec. Workers, Local 501 v. NLRB*, 341 U.S. 694, 701–02, 702 n. 7 (1951)).

Thus, Defendants have been conspiring with VIT to deliberately use their statutory authority to interfere with the ILA's rights under federal labor law and to thwart the administration of the ILA's new technology and workforce protection provisions under the Master Contract.  As previously stated, Defendant Edwards admits that he directs the operations of Virginia's marine and inland terminal facilities through VIT.  *See* **Exhibit A**.

None of Defendants' conduct can be categorized as "legitimate state activity" that merely affects labor, as Defendants imply in their brief.  *See* Defs.' Br., p. 19.  This is much more deliberate conduct aimed at undermining the ILA's federally protected rights under the NLRA, given the pattern of unilateral implementation of new technology resulting in "[t]he ILA . . . repeatedly rais[ing] concerns and fil[ing] contractual grievances against VIT" (*id.*, ¶ 40), to no avail.

**V.**

**VIT IS NOT AN INDISPENSABLE PARTY TO THIS LITIGATION**

Defendants miss the mark in several ways when they argue that VIT is an indispensable party to this action.  Defendants attempt to carry water for VIT, contending that any judgment rendered in this lawsuit could somehow affect VIT's ability to defend itself in "parallel or subsequent litigation." Defs.' Br., p. 24.

1003-656
148850

22

However, as already stated above, the ILA is not claiming breach of contract against VIT, nor does the Complaint seek any relief against VIT. Despite having the burden of demonstrating that VIT must be joined for a just adjudication (*see Am. Gen. Life*, 429 F.3d at 83, 92), Defendants have not articulated a legally cognizable interest that VIT has in the outcome of this case, other than conjecturing that VIT could one day be subject to litigation based on an illusory breach of contract claim. [2] VIT's presence or lack thereof bears no consequence on the outcome of this matter. *See Nw. Fed. Credit Union v. SBC Fin., LLC*, No. 16 Civ. 1299, 2017 WL 7737324, at *4 (E.D. Va. Jan. 18, 2017) (denying motion to dismiss where signatories to a contract were not named in lawsuit because they were not necessary and indispensable parties) (citing *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 434 (4th Cir. 2014)).

Even if this Court were to conclude that VIT is an indispensable party, which it is not, it can be added later as third-party defendant by VPA, added in an amended pleading by the ILA, or added via intervention under Rule 24 of the Federal Rules of Civil Procedure. Dismissal at this early juncture on this basis is inappropriate and considered a "drastic remedy, . . . which should be employed only sparingly" *Nat'l Union Fire*, 210 F.3d at 250.

---

[2] Like most collective bargaining agreements, the Master Contract has extensive internal contractual remedies for resolving any disputes **without** resorting to litigation, and furthermore Section 301 of the Labor Management Relations Act would preempt any "breach of contract" claim by the ILA against VIT. 29 U.S.C. § 185; *Teamsters v. Lucas Flour Co.*, 369 U.S. 95 (1962). The ILA alleged in its Complaint that it is, in fact, pursuing contractual remedies against VIT. Compl., ¶ 40.

1003-656
148850

## CONCLUSION

For the foregoing reasons, Plaintiff International Longshoremen's Association respectfully requests that this Court deny Defendants' motion to dismiss in its entirety.

Dated:     Alexandria, VA
           October 2, 2025

                              Respectfully submitted,


                              ____/s/Justin P. Keating_____
                              Justin P. Keating (VSB #75880)
                              Treyvon Jordan (VSB #101153)
                              BEINS, AXELROD & KEATING, P.C.
                              1800 Diagonal Rd, Suite 600
                              Alexandria, VA 22314
                              Telephone: 703.966.3193
                              jkeating@beinsaxelrod.com
                              tjordan@beinsaxelrod.com

                              John P. Sheridan (Pro Hac Vice)
                              Brian A. Jasinski (Pro Hac Vice)
                              MAZZOLA MARDON, P.C.
                              39 Broadway, 34th Floor
                              New York, NY 10006
                              212.425.3240
                              jsheridan@mmmpc.com
                              bjasinski@mmmpc.com

                              **COUNSEL FOR PLANTIFF**

1003-656
148850

24